IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANNE NEWBOLD, on behalf of herself and others similarly situated, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, and VERIZON TELEMATICS, INC., f/k/a HUGHES TELEMATICS, INC., )<br>)<br>Defendants. ) | No. 13 C 9131<br><br>Judge John J. Tharp, Jr. |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Anne Newbold ("Newbold") brings this putative class action alleging Verizon Telematics Inc. f/k/a Hughes Telematics, Inc. ("Verizon") and State Farm Mutual Automobile Insurance Company ("State Farm") violated the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq. ("TCPA") by placing calls using an automatic telephone dialing system ("ATDS") or prerecorded voice message without obtaining prior express consent. Defendant State Farm has moved to strike the class allegations and to dismiss Newbold's claims against State Farm. Defendant Verizon has moved to dismiss or stay the case based on the doctrine of primary jurisdiction. For the reasons set forth below, State Farm's Motion (Dkt. 37) is denied as to the Motion to Dismiss, and Verizon's Motion to Dismiss or Stay (Dkt. 42) is denied. State Farm's Motion to Strike Class Allegations is denied as moot, and Newbold is granted leave to amend the proposed class definition within 14 days of this Order.

1

## BACKGROUND[1]

State Farm customers have the ability to enroll in the "Drive Safe & Save with In-Drive" program (the "In-Drive" program). Am. Compl., Dkt. 17, at ¶ 31.[2] Once enrolled, the physical "In-Drive device" is shipped to the newly enrolled customer. The enrolled customer is able to install the device in the customer's car and is then asked to call "888-665-9901" to confirm proper installation. As a benefit to the State Farm customer, "as [the customer] drive[s], [State Farm will] collect information such as [the] driving behaviors and mileage, and calculate [the customer's] discount." In addition, the In-Drive device has a "State Farm Button" that provides direct access to a State Farm representative for customer service, policy claims, and roadside assistance. The In-Drive program itself is run by Verizon, and the program's brochures and website both list a copyright notice for Verizon. The In-Drive program materials also refer to State Farm and its trademarks and indicate that the service is exclusive to State Farm policyholders.

Anne Newbold is not a State Farm policyholder and has never participated in the In-Drive program. In April 2013, however, she received a call on her cell phone that began with a recorded voice, which stated, "We are calling about the device we sent you. Press 1 to be connected to a representative." Newbold had not consented to receive any such calls and had never requested nor received any In-Drive device.

---

[1] On a motion to dismiss, the Court accepts all well pleaded facts as true and construes all inferences in favor of the plaintiff. *Gessert v. United States*, 703 F.3d 1028, 1033 (7th Cir. 2013). Therefore, on this motion, the Court draws the facts from the Amended Complaint, Dkt. 17, as well as the documents that are both critical to the complaint and referred to by the complaint. *See* Fed. R. Civ. P. 10(c); *Adams v. City of Indianapolis*, 742 F.3d 720, 729 (7th Cir. 2014).

[2] The In-Drive device and associated programs are described in detail on its website at http://www.in-drive.com/sf/, which was referenced in the complaint and is central to its claims. Am. Compl., Dkt. 17, at ¶ 29; *see also Adams*, 742 F.3d at 729.

Newbold filed a class complaint on behalf of herself and others who received these types of calls to either their cell phones or their residential phones. Am. Compl., at ¶ 42. The amended complaint alleges that both State Farm and Verizon are liable under the TCPA for placing these automated calls to cell phones and residential phones without the recipient's consent. *See* 47 U.S.C. § 227(b)(1)(A)(iii) and (B). Verizon and State Farm contend that the complaint plainly suggests that a "wrong number" must have been dialed and that the intended recipient of the call must have been a State Farm policyholder who had enrolled in the In-Drive program, received an In-Drive device, and consented to receive automated calls. *See* Def.'s Mem., Dkt. 38, at 2–3; Def.'s Mem., Dkt. 43, at 1–2. State Farm has moved to strike the class allegations on the basis that Newbold's proposed class definition is defective and has moved to dismiss the claims against State Farm. Verizon does not challenge the sufficiency of the complaint against itself, but moves to stay or dismiss this case without prejudice until after the FCC issues rulings relating to pending TCPA petitions.

## DISCUSSION

### I. State Farm's Motion to Strike the Class Allegations

State Farm argues that Newbold's proposed class definition is defective and fails to comply with the requirements of Fed. R. Civ. P. 23. Newbold's proposed class definition reads:

> All persons in the United States to whom State Farm or Verizon Telematics, or their affiliated companies or agents made a call: to such person's cell phone using an ATDS or artificial or prerecorded voice mentioning In-Drive; or to such person's residential telephone line, using an artificial or prerecorded voice regarding In-Drive.

Am. Compl., Dkt. 17, at ¶ 42. State Farm argues that this class definition is too broad and includes many customers who consented to receive such calls. *See* Def.'s Memo., Dkt. 38, at 6–7. State Farm further argues that Newbold, a "wrong number" recipient of these calls, would not meet the typicality, adequacy, or commonality requirements of Rule 23(a), or the predominance

3

requirement of Rule 23(b)(3), because most recipients of such calls would have been consenting subscribers of In-Drive. *Id.* at 6–9. Finally, State Farm argues that Newbold, who allegedly received the offending call on her cell phone, could not represent class members who had received such calls on their residential land lines. *Id.* at 7.

Rather than defend her originally proposed class definition, Newbold proposes instead that the Court grant her leave to narrow her proposed class definition to include only people who have not enrolled in In-Drive but received such calls on their cell phones. *See* Pl.'s Resp., Dkt. 46, at 5. State Farm maintains that the amended complaint lacks allegations showing that the proposed amended class satisfies the requirements of Rule 23, but that argument is premature. The Court grants leave for Newbold to amend her complaint and her class certification motion within 14 days of this Order. State Farm is free to challenge the amended class action definition by further motion in response to that filing. State Farm's motion to strike the current class allegations, however, is denied as moot.

## II. State Farm's Motion to Dismiss

State Farm also argues that Newbold's claims against State Farm should be dismissed, because it cannot be liable for any TCPA violations allegedly committed by Verizon. State Farm contends that the facts alleged in the complaint do not suggest that State Farm could liable for Verizon's actions under any kind of agency theory.

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "The complaint 'must actually *suggest* that the plaintiff has a right to relief.'" *Indep. Trust Corp. v. Stewart Info. Servs. Corp.,* 665 F.3d 930, 935 (7th Cir. 2012) (quoting *Windy City Metal Fabricators & Supply, Inc. v. CIT Technology Financing Services,* 536 F.3d 663, 668 (7th Cir. 2008) (emphasis in original)). Therefore, to survive a motion to dismiss, a

4

complaint alleging agency liability "must allege a factual predicate to create the inference of agency." *Whitley v. Taylor Bean & Whitacker Mortg. Corp.*, 607 F. Supp. 2d 885, 895 (N.D. Ill. 2009); *see also Montel Aetnastak, Inc. v. Miessen*, 998 F. Supp. 2d 694, 705 (N.D. Ill. 2014) ("Merely pleading the legal conclusions of agency is insufficient."). In this case, Newbold's complaint needs to allege facts that could plausibly support a theory of liability against State Farm for the phone call at issue.

The complaint does not allege that State Farm is directly liable for making the robocalls concerning the In-Drive program, but rather that it is derivatively liable for the calls because in making the calls Verizon was acting as its agent.[3] In a 2013 ruling, the Federal Communications Commission ("FCC") has issued guidance directly relevant to the issue of vicarious liability under the TCPA. *See In re Joint Petition filed by Dish Network, LLC*, FCC Declaratory Ruling, 28 FCC Rcd. 6574 (2013) [hereinafter "*Dish Network*"]. More specifically, in *Dish Network* the FCC "clarif[ied] that while a seller does not generally 'initiate' calls made through a third-party telemarketer within the meaning of the TCPA, it nonetheless may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *Dish Network* ¶ 1. "A seller may be held

---

[3] State Farm's contention that Newbold claims that State Farm is directly liable for any calls regarding the In-Drive program, Def.'s Mem., Dkt. 38, at 9–10, is not correct. Although paragraph 1 of the complaint alleges that "State Farm is directly or vicariously liable" for calls concerning the In-Drive program, the more specific allegations of her complaint make clear that Newbold is proceeding on a theory of derivative liability, founded on agency, with respect to State Farm. *See* Am. Compl., Dkt. 17, at ¶¶ 39, 61, 69 (alleging only vicarious liability as to State Farm). In any event, a complaint is not required to plead all potentially viable legal theories—only facts sufficient to allege some plausible legal claim. *See, e.g., Hatmaker v. Memorial Medical Center,* 619 F.3d 741, 743 (7th Cir. 2010) ("plaintiffs in federal courts are not required to plead legal theories"). The relevant question, then, is whether the facts alleged in Newbold's complaint are adequate to give rise to some plausible legal claim. The Court concludes that she has alleged sufficient facts to give rise to derivative liability premised on some form of agency relationship with Verizon.

5

vicariously liable for violations 'under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification.'" *Smith v. State Farm Mut. Auto. Ins. Co.*, No. 13 C 2018, 2013 WL 5346430 (N.D. Ill. Sept. 23, 2013) (quoting *Dish Network* ¶ 28). Newbold argues that State Farm is liable in this action under the agency theories of actual authority, apparent authority, and ratification, as well as a joint venture theory.

      The federal common law of agency generally follows the American Law Institute's Restatements of the Law. *See Hollingsworth v. Perry*, 133 S. Ct. 2652, 2666 (2013) (applying the Restatement (Third) of Agency to analyze Article III standing); *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740, 751 nn.18–22, 752 (1989) (turning to the Restatement (Second) of Agency seven times to inform its agency analysis under federal common law); *United States v. Aldridge*, 642 F.3d 537, 541 (7th Cir. 2011) (applying the Restatement to determine whether a private party was acting as an agent of the state for Fourth Amendment purposes); *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000) ("We also note that the Illinois law of agency, as well as the federal common law of agency, accord with the Restatement."). The Restatement defines agency as two parties assenting to an arrangement by which the agent "shall act on the principal's behalf" and "subject to the principal's control." *See* Restatement (Third) of Agency § 1.01 (2006). In other words, the test for determining whether a principal-agent relationship exists is "whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal." *Chemtool, Inc. v. Lubrication Techs., Inc.*, 148 F.3d 742, 745–46 (7th Cir. 1998) (endorsing this two-prong test for Illinois law and noting that the test is "not materially different" from the common law of other jurisdictions). A middleman who simply brings together a buyer and seller is not an agent, but a broker who takes

6

an active role in the negotiation and pricing will be deemed an agent. *See Whitley v. Taylor Bean & Whitacker Mortg. Corp.*, 607 F. Supp. 2d 885, 895 (N.D. Ill. 2009).

The complaint alleges specific facts that plausibly support an inference that Verizon acted as State Farm's agent in managing the In-Drive program for State Farm—conduct that encompasses the placing of automated calls, including the call to Newbold, concerning the program on State Farm's behalf. State Farm's arguments regarding dismissal have as their common core the premise that the call placed to Newbold was "a 'wrong number' call intended for a subscriber to the In-Drive device." Def.'s Mem., Dkt. 38, at 1. But nowhere does the complaint allege, or acknowledge, that the call Newbold received was intended for a subscriber to the In-Drive program. To the contrary, the complaint alleges that "the purpose of the robocall to Ms. Newbold was to connect her to . . . a call center designed to sell and advise consumers about the In-Drive devices and State Farm insurance products and services." Am. Compl., Dkt. 17, at ¶ 29; *see also id.* at ¶ 30 (phone number used to place the offending call "was operated by Verizon for purposes of . . . marketing the In-Drive device and the various State Farm insurance services associated with it"). And in her response brief to Verizon's primary jurisdiction motion,[4] Newbold maintains not only that she did not give her number to either of the defendants but also that she has had the same number "since before the start of the In-Drive program" (*i.e.*,

---

[4] The Court may consider additional facts set forth in a response brief opposing a motion to dismiss so long as they are not inconsistent with the existing allegations of the complaint. *Albiero v. City of Kankakee*, 122 F.3d 417, 419 (7th Cir. 1997) ("[A] plaintiff may supplement the complaint with factual narration in an affidavit or brief."); *see also Chavez v. Ill. State Police*, 251 F.3d 612, 650 (7th Cir. 2001) ("[T]he well-established law of this circuit provides that, when reviewing a dismissal under Rule 12(b)(6), 'we will consider new factual allegations raised for the first time on appeal provided they are consistent with the complaint.'") (quoting *Veazey v. Commc'ns & Cable of Chi., Inc.*, 194 F.3d 850, 861 (7th Cir. 1999)). These factual allegations are not an attempt to "amend [the] complaint in [the plaintiff's] response brief," which would be impermissible, *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011), but rather are a way to show a set of plausible facts consistent with the complaint on which relief may be granted. *Albiero*, 122 F.3d at 419.

the number likely was not reassigned to her from an In-Drive subscriber). Pl.'s Resp., Dkt. 47, at 2.[5] In other words, Newbold is alleging that the call she received was not a "wrong number" at all, but rather an unsolicited sales pitch for both State Farm's insurance products and Verizon's In-Drive program. State Farm may dispute this as a matter of fact, but that dispute cannot be resolved on a motion to dismiss.

What the complaint plausibly describes is a joint enterprise between State Farm and Verizon to market the In-Drive program for their mutual benefit. A press release issued by representatives of both State Farm and Verizon[6] on July 28, 2011 discusses the In-Drive device and the Drive Safe & Save program, announcing a "major joint effort . . . called In-Drive®[,] . . . tailored specifically for State Farm policyholders." Press Release, Dkt. 48-A, at 1.[7] The press release goes on to quote State Farm Senior Vice President Mike Wey and to provide the public with media contacts from both companies. *Id.* at 1–2. To the extent that partners or joint venturers are pursuing the objectives of their mutual enterprise, they can be deemed agents of

---

[5] Newbold's proposed revised class definition appears to include non-subscribers who were subject to robocalling whether a subscriber's number had been reassigned to them or for other reasons entirely. The Court makes no judgment at this time whether such a class can be certified.

[6] At the time of the press release, the entity now known as Verizon Telematics, Inc., was known as Hughes Telematics, Inc, and the press release used the name "Hughes Telematics" to describe the company.

[7] Although the press release itself was not attached as an exhibit to the amended complaint, the complaint referenced and quoted the press release and the URL on Verizon's website where it may still currently be found. *See* Am. Compl., Dkt. 17, at ¶ 31. State Farm also attached the press release as an exhibit to its Reply on this motion. "[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." *Adams v. City of Indianapolis*, 742 F.3d 720, 729 (7th Cir. 2014) (internal quotation marks omitted). Further, courts may take judicial notice of undisputed material hosted on a party's public website. *See, e.g.*, *LaBella Winnetka, Inc. v. Village of Winnetka*, 628 F.3d 937, 944 n.3 (7th Cir. 2010). Therefore, this Court may consider the contents of the press release—which is central to Newbold's claim against State Farm— without converting this Rule 12(b)(6) motion into a Motion for Summary Judgment.

that enterprise. *See Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 730 (7th Cir. 2014) (stating Illinois rule that joint venturers are liable for actions taken by its co-venturers); *Fail-Safe LLC v. A.O. Smith Corp.*, 744 F. Supp. 2d 831, 861 (E.D. Wisc. 2010) (characterizing each joint venturer to be both "agent" and "principal" in relation to other co-venturers under Wisconsin law). In addition, the amended complaint includes allegations that give rise to plausible inferences that State Farm exercised some degree of control over Verizon's efforts in support of the program, but generally and more specifically with respect to the calls originating from the In-Drive call center. Most fundamentally, the In-Drive program collects driver behavior data that State Farm uses to determine discounts for individual policyholders. Am. Compl., Dkt. 17, at ¶ 34. In other words, State Farm controls the nature of the data that Verizon's In-Drive device records. And to further the objectives of the In-Drive program, State Farm (allegedly) provided Verizon with contact information of its policyholders and others for Verizon to contact. Am. Compl., Dkt. 17, at ¶ 40(b). Thus, the complaint alleges sufficient facts to infer that State Farm and Verizon entered into a close relationship that meets the requirements of an agency or a joint enterprise relationship, which could suffice to impose liability on State Farm for Verizon's actions on behalf of the enterprise.

The complaint also alleges sufficient facts to suggest that State Farm could be liable under a theory of apparent authority, as well. In *Dish Network*, the FCC gave illustrative examples that may support a finding of apparent authority: the purported agent's access to proprietary pricing or customer information, direct access to sales or customer systems, and authority to use the purported principal's intellectual property. *Dish Network* ¶ 46. Each of these examples is present in the complaint. The In-Drive program has access to proprietary customer contact information and driving behavior data. Am. Compl., Dkt. 17, at ¶¶ 34, 40(b). The In-

9

Drive materials reference State Farm discounts, electronic monitoring, and direct access to State Farm representatives. *Id.* at ¶¶ 34–37, 40(d), 40(h), 40(j). The In-Drive program is authorized to use State Farm's proprietary trademarks and trade names. *Id.* at ¶¶ 35, 40(f). When viewed in a light most favorable to the plaintiff, these allegations provide a sufficient factual basis to draw inferences that the relationship between State Farm and the call center were "more involved than simply bringing the [customer] and [vendor] together." *Whitley*, 607 F. Supp. 2d at 895. While the allegations of the amended complaint supporting an agency theory are not robust, it is simply not accurate to contend, as State Farm does, that Newbold has made nothing but conclusory allegations of an agency relationship between Verizon and State Farm that would be sufficient to support derivative liability on State Farm's part for calls made by Verizon in violation of the TCPA. Newbold will eventually have to prove some kind of agency or joint venture liability in order to recover against State Farm with respect to the specific automated call at issue, but at this stage she has pleaded sufficient allegations to take discovery on her claim against State Farm. Accordingly, State Farm's Motion to Dismiss Count I, relating to cell phone calls, is denied.

With respect to Count II, however, the motion is granted. As discussed above, Newbold has not alleged receiving calls to a residential telephone line, her brief does not defend her original choice to include allegations relating to residential telephone lines, and her new proposed class definition makes no reference to residential telephone lines. *See supra* Part I; Pl.'s Resp., Dkt. 46, at 5. Count II, which relates only to calls made to residential phone lines, is therefore dismissed.

This Court also construes the complaint's paragraphs labeled as "Count III" as part of the complaint's prayer for relief rather than as a separate cause of action. The paragraphs labeled "Count III" simply allege that the defendants willfully and knowingly violated the TCPA and

10

that Newbold is therefore entitled to treble damages. *See* Am. Compl., Dkt. 17, at ¶¶ 73–76; 47 U.S.C. § 227(b)(3)(B). As discussed above, the amended complaint alleges that Newbold was called not as a wrong number but as part of a marketing effort. Am. Compl. ¶¶ 29–30. Those allegations suffice as a basis to allege that the calls were made willfully or knowingly. Although neither the TCPA nor FCC regulations define the terms "willfully or knowingly," courts generally have interpreted the terms to mean voluntary, intentional, actions, and not to require specific knowledge that the action constitutes a violation of the TCPA. *See, e.g., Sengenberger v. Credit Control Servs.*, No. 09 C 2796, 2010 WL 1791270, *6 (N.D. Ill. May 5, 2010). Accordingly, the motion to dismiss is denied with respect to Newbold's claim for treble statutory damages.

### III. Verizon's Motion to Stay or Dismiss Under the Doctrine of Primary Jurisdiction

In addition to State Farm's Motion to Dismiss, Verizon has moved to Stay or Dismiss the case based on potential future rulemaking and guidance from the FCC. *See* Def.'s Mot., Dkt. 42. Specifically, Verizon argues that the doctrine of primary jurisdiction justifies the dismissal or stay of this case until after the FCC has issued its decisions in two TCPA matters pending before the Commission. *Id.*

Verizon cites two pending petitions, "a petition for expedited declaratory ruling filed by United Healthcare, Inc. ("United Healthcare"), and a petition for rulemaking filed by ACA International ("ACA")." Def.'s Br., Dkt. 43, at 2. Verizon argues that the FCC's rulings on these pending petitions could be dispositive of the issues in this case because the called party, Newbold, was a "wrong number." *See id.* at 12–13. United Healthcare has requested the FCC rule that callers are not liable under the TCPA when calling reassigned numbers through at least one of three potential interpretations of the statute:

- Find that when a caller has properly obtained "prior express consent" from a party to call that party's telephone number, such "prior express consent" encompasses autodialed and prerecorded non-telemarketing calls to that number until the caller learns that the number provided has been reassigned;
- Confirm that the term "called party" encompasses both the consenting party and the new subscriber of the reassigned number until the caller learns from the call recipient that the two parties are not the same; and
- Confirm that a "good faith" exception from TCPA liability exists for autodialed and prerecorded non-telemarketing calls to telephone numbers that have been reassigned from a prior express consenting party until the caller learns of the reassignment.

*See* United Healthcare Pet., Dkt. 43-3, at 3–4. The ACA petition seeks an FCC ruling on several issues, two of which are potentially relevant to the present case, requesting that the FCC:

- Clarify that prior express consent attaches to the person . . . and not the specific telephone number provided by the [person], and
- Establish a safe harbor for autodialed "wrong number" non-telemarketing calls to wireless numbers.

*See* ACA Pet., Dkt. 43-6, at 1–2. Verizon argues that these pending agency decisions "squarely" address the legal issues relevant to the TCPA claims in this case, and that "judicial economy weighs against issuing a decision that may be undermined by an anticipated ruling from the FCC." Def.'s Mem., Dkt. 43, at 12.

As a threshold matter, to the extent that Newbold's claim, or the claims of other putative class members, are not premised on a theory that they were the recipients of "wrong number" calls intended for former subscribers, Verizon's primary jurisdiction argument has no relevance. Resolution of the pending petitions would not necessarily have any bearing on liability for calls other than "wrong number" or "reassigned number" calls.

And to the extent that any members of the putative class were the recipients of "wrong number" or "reassigned number" calls that are the subject of the pending FCC petitions, the Court concludes that the factors informing the primary jurisdiction doctrine do not warrant a stay or abstention in this case. Primary jurisdiction "is a prudential doctrine under which courts may,

under appropriate circumstances, determine that the initial decision making responsibility should be performed by the relevant agency rather than the courts." *Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92, 97 (N.D. Ill. 2013) (quoting *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 780 (9th Cir. 2002)). Primary jurisdiction, which "promot[es] proper relationships between the courts and administrative agencies charged with particular regulatory duties," is proper whenever enforcement of a claim originally cognizable in the courts "requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *United States v. W. Pac. R. Co.*, 352 U.S. 59, 63–64 (1956). In such cases, "the judicial process is suspended pending referral of such issues to the administrative body for its views." *Id.* at 64.

In *Jamison v. First Credit Services, Inc.*, when considering a motion to stay requesting the court invoke the doctrine of primary jurisdiction while waiting for FCC interpretation of another TCPA issue, Judge Kendall explained that "the doctrine should be invoked sparingly," not "every time a court is presented with an issue conceivably within [an] agency's ambit." 290 F.R.D. at 97–98 (quoting *United States v. DISH Network, LLC*, No. 09–3073, 2011 WL 475067, at *2 (C.D. Ill. Feb. 3, 2011)); *see also Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008)). Because "[t]he Seventh Circuit has not defined specific criteria for how courts should apply the primary jurisdiction doctrine," Judge Kendall synthesized the rules from cases from this Circuit and other circuits to apply a four-factor test:

> (1) whether the issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent ruling; and (4) whether a prior application to the agency has been made.

*Id.* at 98 (citing *Arsberry v. Illinois*, 244 F.3d 558, 563 (7th Cir. 2001); *DISH Network, LLC*, 2011 WL 475067, at *2; *Frydman v. Portfolio Recovery Assocs.,* No. 11 C 524, 2011 WL

13

2560221, at *2 (N.D. Ill. June 28, 2011)). The Court agrees with Judge Kendall that this four-factor test is an appropriate analytical framework to apply in such cases.

Applying the first factor, the Court concludes that the disputed legal issues in the present case fall within the conventional experience of the courts and require no specialized technical or policy considerations within the FCC's expertise. In determining whether the defendants are entitled to a wrong number or reassigned number defense, the Court will engage in statutory interpretation, a task well within "the conventional experience of judges." *Arsberry v. Illinois*, 244 F.3d 558, 563 (7th Cir. 2001); *Jamison*, 290 F.R.D. at 97. And while this Court appreciates that the FCC has a great deal of specialized technical expertise relating to both wireline and wireless telephone networks, technical issues are not material to understanding how a caller might dial a wrong number or a reassigned number. For this reason, evaluation of the first factor weighs against staying this case.

As for the second factor, the scope of agency discretion, the Court concludes that despite having broad discretion over the TCPA generally, the FCC does not have discretion over the narrow legal issue in this case. Congress granted the FCC authority to issue regulations implementing and interpreting the TCPA. *See* 47 U.S.C. § 227(b)(2) (granting the FCC rulemaking authority to make exemptions to the artificial or prerecorded voice rules); *id.* § 227(c) (granting the FCC broad discretion on the technical means used to implement the TCPA's so-called "do not call" list); *id.* § 227(d) (granting the FCC rulemaking authority over technical and procedural standards over telephone equipment governed by the TCPA). However, a closer look reveals that the FCC does not have the authority to create exemptions to the cell phone provisions of the TCPA, except for "calls . . . that are not charged to the called party." *Id.* § 227(b)(2)(C). In contrast, the FCC has broader authority to make rules that exempt calls made

for noncommercial purposes or for certain categories of commercial calls when the call is made to a residential telephone. *See id.* § 227(b)(2)(B) (granting the FCC authority to prescribe regulations to exempt calls from the prohibitions in § 227(b)(1)(B), which covers only calls to residential landlines). Because Newbold does not allege that she received a call on a residential landline, and her proposed amended class definition would exclude recipients of landline calls, this case avoids the "arcane regulatory issues" within the FCC's area of policy expertise and discretion. *Arsberry*, 244 F.3d at 563. The second *Jamison* factor therefore weighs against referral to the FCC.

The Court turns to the third factor and considers whether there is a substantial danger of inconsistent rulings. Verizon argues that because there are at least six other district courts that have granted stays, continuing to litigate the current action would result in potential inconsistency. Def.'s Reply, Dkt. 49, at 1–2. Critically, however, those courts are located in other circuits and are not bound by Seventh Circuit precedent.[8] The Seventh Circuit has already had the opportunity to analyze TCPA liability when a caller, relying on prior express consent, calls a cell phone only to find that the number has since been reassigned to a nonconsenting new subscriber. *See Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, (7th Cir. 2012). The

---

[8] Verizon lists six cases stayed by the courts pending resolution of the FCC petitions: *Higgingbotham v. Hollins*, No. 14-CV-2087, 2014 WL 2865730 (D. Kan. June 24, 2014); *Gusman v. Comcast Corp.*, No 13-CV-1049, 2014 WL 2115472 (S.D. Cal. May 21, 2014); *Fontes v. Time Warner Cable Inc.*, No. 2:14-CV-2060, 2014 WL 2153919 (C.D. Cal. May 19, 2014); *Barrera v. Comcast Holdings Corp.*, No. 14-CV-343, 2014 WL 1942829, at *2 (N.D. Cal. May 12, 2014); *Heinrichs v. Wells Fargo Bank*, No. 13-5434, 2014 WL 2142457 (N.D. Cal. Apr. 15, 2014); and *Matlock v. United Healthcare*, No. 2:13-CV-2206, 2014 WL 1155541 (E.D. Cal. Mar. 20, 2014). Def.'s Reply, Dkt. 49, at 1–2. During the pendency of this motion, one of the cited cases, *Higginbotham v. Hollins*, was voluntarily dismissed on December 22, 2014. *See* Order, *Higginbotham*, No. 14-CV-2087, Dkt. 35. In another case, *Heinrichs v. Wells Fargo Bank*, lifted its stay on October 16, 2014, after receiving a letter from the FCC's Acting Deputy General Counsel stating that he was not able to predict when the Commission will vote to approve a final order on these TCPA petitions. Order Lifting Stay, *Heinrichs*, No. C 13-05434, Dkt. 62 (Oct. 16, 2014). The other four cases remain stayed as of the date of this Order.

15

Seventh Circuit turned to the TCPA's statutory text describing "the prior express consent of the called party" and concluded that the "called party" unambiguously meant the current subscriber of that number, not any prior subscribers whom the caller intended to reach. *Id.* at 639–40. The Seventh Circuit therefore concluded that when a subscriber consents to receive automated calls, the consent lapses when the number is reassigned to a new nonconsenting subscriber. *Id.* at 641. Further, in a hypothetical the Seventh Circuit also indicated that, for similar reasons, consent given for a wrong number would also be ineffective. *Id.* ("It is hard to see why Customer's error [in writing down his own number] should be treated differently from the reassignment of a number."). In other words, *Soppet* has already directly decided several of the questions at issue in United Healthcare's and ACA's FCC petitions: "Prior express consent" does not extend to a new subscriber at a reassigned number; the "called party" is the party who actually receives the call; and "prior express consent" attaches to the person and not the number. The only issues remaining for the FCC petitions that have not already been decided in *Soppet*, therefore, are whether callers who rely on a prior subscriber's consent are entitled to a "good faith" exception or other "safe harbor." United Healthcare Pet., Dkt. 43-3; ACA Pet., Dkt. 43-6; *see also* Def.'s Reply, Dkt. 49, at 2 (highlighting the possibility of an FCC creating a TCPA "safe harbor"). And because this Court is bound by Seventh Circuit precedent, any ruling that this Court makes cannot be said to contribute to a "danger of inconsistent ruling." *Jamison*, 290 F.R.D. at 98. The Seventh Circuit has already ruled, and this Court is obligated to rule consistently with that existing opinion.

Further, Verizon argues that if the FCC does happen to provide a definition that is different than that of the Seventh Circuit, this new construction would be entitled to deference under the *Chevron* doctrine and could supersede the Seventh Circuit's earlier interpretation. Def.'s Reply, Dkt. 49, at 3. In doing so, Verizon misreads both *Soppet* and the Supreme Court's

16

opinion in *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005). Verizon correctly observes that "[i]f a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute." *Id.* at 980 (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 865-66 (1984)). However, that rule applies only "[i]f a statute is ambiguous." *Id.* "A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference . . . if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Id.* at 982. The Seventh Circuit never suggested that the definition of "called party" is ambiguous or that Congressional intent is unclear. *See Soppet*, 679 F.3d at 641–42. In fact, the Seventh Circuit characterized alternative interpretations of the statute as "odd," not "remotely" suggested by the statutory text, and incompatible with "the way the law understands consent." *Id.* at 641. Therefore, this Court is unpersuaded that any contrary interpretation by the FCC would necessarily be entitled to deference under the *Chevron* doctrine. Accordingly, this Court sees no reason to stay this case on the speculative possibility that the FCC might interpret the statute in a way that conflicts with *Soppet* but that still might be entitled to *Chevron* deference.

The "safe harbor" or "good faith" proposals in the United Healthcare and the ACA petitions do not justify staying these proceedings, either. As noted above, the FCC has the ability to make broad exemptions to certain types of calls prohibited by the TCPA, under 47 U.S.C. § 227(b)(2)(B). However, as noted above, those exemptions only apply to residential land lines under § 227(b)(1)(B). *Id.* § 227(b)(2)(B). The FCC is limited in its scope of exemptions for cellular lines by § 227(b)(2)(C), which only allows the FCC to exempt calls to cell phones when not charged to the called party. *Id.* According to the complaint, Verizon placed a call to

17

Newbold's cell phone, which was presumably charged to her as part of a subscription plan. The Court does not see any statutory support that grants the FCC authority to create a safe harbor or a good faith exception for automated calls to cell phones. Therefore, the specific allegations of this case would not fall under any good faith exception the FCC may promulgate under its statutory authority.

The Court notes that, despite the foregoing analysis of the FCC's statutory authority to create a TCPA safe harbor for cell phones, the FCC has promulgated a 15-day safe harbor provision for numbers recently ported from landline to wireless service. *See In re Rules and Regulations Implementing the TCPA*, 19 FCC Rcd. 19215 (2004). In those proceedings, the FCC addressed concerns that the FCC lacked the statutory authority to create exemptions to the cell phone provisions. *Id.* at ¶ 9. The FCC responded by citing the necessity of a "technologically reasonable" time period "to allow callers to come into compliance with the rules" by updating their marketing lists to reflect newly added numbers to the publicly accessible wireless number databases. *Id.* at ¶¶ 9–10. The technical justifications cited by the FCC in creating a safe harbor for recently ported numbers do not apply to the consent issue in this case. Unlike "do not call" or wireless number lists, a company's list of consenting subscribers cannot be compared to a publicly accessible database, so the technical considerations do not apply. *See id.* at ¶ 10 (describing databases that allow callers to ensure compliance with the TCPA). Further, the FCC has expressly observed that extending a safe harbor provision for "any call made erroneously or inadvertently" would be "contrary to the intent of Congress." *Id.* at ¶ 11. Finally, the FCC's unwillingness in that proceeding to extend any safe harbor beyond a mere 15-day period, *see id.* at ¶ 10, leads this Court to believe that any FCC-recognized safe harbor provision would be unlikely to have any bearing on the call made to Newbold at issue in this case. Newbold asserts

18

that she has had her current cell phone number since before the In-Drive program began in 2011, and the call at issue occurred in 2013. For all of these reasons, the Court finds that there is not a substantial danger of inconsistent ruling under the facts of this case, and the third factor listed in *Jamison* weighs against staying this case.

With regard to the fourth factor outlined above, whether prior application to the agency has been made, the Court notes that this action was commenced approximately 3 weeks prior to the United Healthcare's petition to the FCC, and the ACA petition was filed even later. *See* Compl., Dkt. 1 (dated Dec. 20, 2013); United Healthcare Pet., Dkt. 43-3, at i (dated Jan. 16, 2014); ACA Pet., Dkt. 43-6, at i (dated Jan. 31, 2014). This factor weighs in favor of denying the motion to stay. Taken together, the four factors lead this Court to conclude that the FCC is unlikely to issue a ruling that would affect the legal analysis for erroneously dialed cell phones and that abstention under the doctrine of primary jurisdiction is not warranted in this case.

Finally, the Court notes that Verizon has had a *de facto* stay of this matter of some seven months while briefing and consideration of its motion has been pending. The FCC, however, has yet to rule on the United Health or ACA petitions and there is no indication (so far as this Court has been advised) that agency action on the petitions is imminent. FCC Commissioner Michael O'Rielly has indicated his desire for the FCC to address TCPA petitions "as soon as possible," but his statement gives no indication of when that might be, or which of the six identified categories of TCPA petitions (only one of which has relevance to reassigned numbers) to address first. *See* Michael O'Rielly, *TCPA: It is Time to Provide Clarity* (Mar. 25, 2014), *available at* Dkt. 43-8. And FCC counsel have explicitly disclaimed being able to predict when the FCC is likely to vote to approve a final order on reassigned numbers. *See* FCC Status Report, *Heinrichs v. Wells Fargo Bank, N.A.*, No. CV 13-05434 WHA, Dkt. 58 (N.D. Cal. Sept. 26, 2014).

Whatever merit the arguments for a stay might have in the abstract (and as discussed, the Court does not believe that those arguments have much merit), it is diminished by the fact that it would delay resolution of a case that has now been pending for more than a year.

\* \* \*

For the reasons set forth above, the Court denies State Farm's Motion to Dismiss with respect to Count I and denies Verizon's Motion to Dismiss or Stay. Count II is dismissed, and the allegations in Count III will be considered as part of Count I. The Court denies State Farm's Motion to Strike Class Allegations as moot, and grants Newbold 14 days to amend her complaint and her Motion to Certify Class.

Dated: January 23, 2015

John J. Tharp, Jr.
United States District Judge